# EXHIBIT 3

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                        CRIMINAL DIVISION

3     - - - - - - - - - - - - - - -:
                                    :
4     UNITED STATES OF AMERICA       :
                                    :
5              v.                    :    Criminal Action No.
                                    :    F-1160-02
6     DORRELL INGRAM,                :
                                    :
7              Defendant.           :
                                    :
8     - - - - - - - - - - - - - - -:

9                        Washington, D.C.

10                     Friday, March 15, 2002

11         The above-entitled matter came on for hearing before
      the Honorable SHELLIE BOWERS, Associate Judge, in courtroom
12    number 302.

13                  THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN
                    OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO HAS
14                  PERSONALLY CERTIFIED THAT IT REPRESENTS THE
                    TESTIMONY AND PROCEEDINGS OF THE CASE AS
15                  RECORDED.

16                  APPEARANCES:

17                  On behalf of the Government:

18                  JOHN SOROKA, Assistant United States Attorney

19
                    On behalf of the Defendant:
20
                    TODD EDELMAN, Esquire
21

22

23

24                       BRUCE W. HERZFELD, RPR
                         OFFICIAL COURT REPORTER
25

1

```
 1                    TABLE OF CONTENTS

 2                   INDEX TO WITNESSES

 3

 4    On behalf of the Government:

 5                         Direct Cross Redirect Recross

 6    Kimberly Metivier

 7        (By Mr. Soroka)           4

 8        (By Mr. Edelman)                16

 9

10

11                      EXHIBITS

12    On behalf of the Government:                    Admitted

13    2 - Photo of front-end damage on Crown Victoria    14

14    3 - Photo of air bags in Crown Victoria            14

15    4 - Photo of front-end damage on Crown Victoria    14

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2                       *  *  *  *  *  *

3            (11:10 a.m.)

4            (Defendant present.)

5            THE COURT:  This is the case of United States

6    versus Dorrell Ingram, case number F-1160-02.  For the

7    prosecution we have?

8            MR. SOROKA:  Good morning, Your Honor.  John

9    Soroka for the United States.

10           MR. EDELMAN:  Good morning, Your Honor.  Todd

11   Edelman on behalf of Mr. Ingram, who is here with me.

12           THE COURT:  All right.  Now, I always sua sponte

13   rule on witnesses, so other than the witness who is

14   testifying, are any of the other people in the courtroom to

15   be witnesses in this preliminary hearing?

16           MR. SOROKA:  No, Your Honor.

17           THE COURT:  Okay.  You may call your first witness

18   then, and you may be seated.

19           MR. SOROKA:  Your Honor, the Government calls

20   Detective Kimberly Metivier.

21           THE COURT:  Very well.

22           Thereupon,

23                KIMBERLY METIVIER,

24   having been called as a witness for and on behalf of the

25   Government, and having been first duly sworn by the Court,
```

1    was examined and testified as follows:

2                     DIRECT EXAMINATION

3           BY MR. SOROKA:

4       Q    Ma'am, would you please state your full name and

5    spell your last name for the benefit of the court reporter?

6       A    Kimberly Jackson Marie Metivier.  Metivier is

7    M-E-T-I-V, as in Victor, I-E-R.

8           THE COURT:  M-E-T-I-V --

9           THE WITNESS:  I-E-R.

10          THE COURT:  Hold it one second.

11          (Pause.)

12          THE COURT:  This is a preliminary hearing on the

13   charge of murder two, second degree murder.

14          MR. SOROKA:  Yes, Your Honor.

15          THE COURT:  Okay.  You may proceed.

16          MR. SOROKA:  Thank you.

17          BY MR. SOROKA:

18      Q    Detective, by whom are you employed and in what

19   capacity?

20      A    The District of Columbia, Washington, D.C.,

21   Metropolitan Police Department, currently detailed to the

22   Major Crash Investigations Unit.

23      Q    And were you so assigned back on the 19th of

24   February, the year 2002, at approximately 9:30, 10:00

25   o'clock p.m.?

4

1         A    Yes, I was.

2         Q    Around that time and on that date, did you have

3    occasion to participate in the investigation of an

4    automobile crash that occurred at 49th Street and Sheriff

5    Road NE?

6         A    Yes, I did.

7              THE COURT:  Slow it down a bit, okay?

8              MR. SOROKA:  Yes.

9              (Pause.)

10             THE COURT:  Okay.

11             BY MR. SOROKA:

12        Q    Now, Detective, I am going to do this in sort of

13   reverse order.  Did you actually go to the scene of 49th and

14   Sheriff?

15        A    Yes, I did.

16        Q    And could you describe the scene when you arrived?

17        A    Upon arriving on the scene, there was some chaos.

18   There were two vehicles that had been involved in a

19   collision.

20             THE COURT:  This was about what time?

21             THE WITNESS:  9:30.

22             THE COURT:  About 9:30.  At 49th and what?

23             THE WITNESS:  Sheriff Road NE.

24             THE COURT:  Okay.

25             BY MR. SOROKA:

1        Q    And you were talking about two vehicles?

2        A    Yes.  Upon arriving on the scene, there were two

3   vehicles.  One was a silverish-bluish Nissan Maxima,

4   four-door.  The passenger side had been T-boned by a Crown

5   Victoria with a horrific intrusion to the passenger side --

6             THE COURT:  Passenger side of what?

7             THE WITNESS:  Of the Maxima.

8             And in the vehicle, to my horror, I found the two

9   decedents, Mr. Robinson and Mr. Williams.

10            BY MR. SOROKA:

11       Q    And when you arrived Mr. Robinson and Mr. Williams

12   were still trapped in the vehicle?

13       A    Yes, they were trapped in the vehicle.

14       Q    Where was the Nissan physically in relation to the

15   intersection?

16       A    Upon impact, it had rotated counterclockwise and

17   went up onto a sidewalk, and the front end came partially

18   upon the stairwell and came to a rest, knocking down an iron

19   guard rail.

20       Q    In terms of what happened to Mr. Robinson and

21   Mr. Williams, did you learn -- were they taken from the

22   scene?

23       A    They had not been pronounced yet on the scene as

24   being deceased.  The doctors at the hospitals or the Medical

25   Examiner's Office has to do it.  But I was advised on the

6

1    scene that they were going to do CPR, attempt resuscitation;

2    however, when I viewed them, I saw no signs of life on the

3    scene.

4        Q    Did you later learn that they had been pronounced

5    dead?

6        A    Yes, I did.

7        Q    Now, what about the other vehicle?

8        A    The other vehicle was a green Crown Victoria with

9    substantial front end damage from T-boning, colliding with

10   the other vehicle.

11            THE COURT:  When you say T-boning, is that talking

12   about broad-siding?

13            THE WITNESS:  Correct.

14            THE COURT:  Broad-siding on what, the passenger

15   side?

16            THE WITNESS:  The passenger side.

17            THE COURT:  Let me ask you, I can't make out this

18   signature.  Is that your signature?

19            THE WITNESS:  Yes.

20            THE COURT:  We can save a lot of time since she

21   says this is her signature on this --

22            MR. SOROKA:  It is a Gerstein, Your Honor.

23            THE COURT:  She can just adopt that as part of her

24   testimony, and then we can just go right to the cross

25   examination unless you want to add something in addition to

1    that.

2              MR. SOROKA:  There is something I wanted to add,

3    but I will do that, Your Honor.  I have a copy of a signed

4    certified copy, and I'll have it marked, and I'll show it to

5    her and --

6              THE COURT:  Okay, and then you can just go into

7    whatever additionally you want to ask.

8              You are calling that Government's 1, the Gerstein?

9              MR. SOROKA:  Yes, Your Honor.

10             THE COURT:  Okay.  Any objection to that being

11   adopted as part of her testimony?

12             MR. EDELMAN:  None, Your Honor.

13             THE COURT:  Okay.

14             (Pause.)

15             BY MR. SOROKA:

16        Q    Detective, I am going to show you what has been

17   marked as Government's Exhibit Number 1 for purposes of this

18   hearing and ask you to take a quick look at it.  Look up

19   when you are finished.

20             Do you recognize it?

21        A    Yes, I do.

22        Q    And what is it, please?

23        A    It is my Gerstein that I had completed for the

24   initial arrest of Mr. Dorrell (sic).

25             THE COURT:  Mr. Ingram.

1          THE WITNESS:  Mr. Dorrell Ingram, thank you.

2          BY MR. SOROKA:

3      Q    Did you have occasion to see Mr. Ingram on that

4  day?

5      A    Yes, I did.

6      Q    Where was it you first saw him?

7      A    On the collision scene.

8      Q    And where was he on the collision scene?  Was he

9  under arrest at the time?

10     A    He had fled from the driver's side of the vehicle.

11 Officers that were behind the Crown Victoria, approximately

12 a block away from the initial impact and then drove up onto

13 the actual scene, observed Mr. Dorrell Ingram flee from the

14 driver's side of the vehicle.  Officer Phifer had attempted

15 to grab him; however, he broke free, and he continued to

16 flee.

17          THE COURT:  On foot?

18          THE WITNESS:  On foot.

19          THE COURT:  After the collision?

20          THE WITNESS:  Correct.

21          Officer Phifer and Officer Hodges -- Hodges was

22 directly behind Phifer in another marked unit -- both gave

23 lookouts for the driver, which included the driver wearing a

24 beige coat.  Officer Purnell, who immediately responded to

25 the scene, observed a gentleman with a beige coat in the

1    woods.  Officer Purnell immediately gave foot chase in which

2    the defendant Mr. Dorrell, seated in front of me to the

3    right of his counsel, hid -- he first jumped a fence and

4    then hid underneath a porch.

5           Officer Purnell and Hodges approached him, when he

6    tried to later make good his escape by walking down the

7    street, and they were able to arrest him, and they had

8    walked him partially down the street.

9       Q    Did the other officers who had seen him leave the

10    car -- were they able to look at him at that point?

11       A    Yes.  Hodges was on the scene, and he observed him

12    flee the vehicle, and he was there to help arrest him.

13           THE COURT:  Officer -- what was the full name?

14           THE WITNESS:  Herman Hodges.

15           THE COURT:  That had actually seen this defendant

16    leaving the vehicle?

17           THE WITNESS:  That's correct.

18           THE COURT:  And had participated in the

19    apprehension?

20           THE WITNESS:  Correct.

21           Officer Phifer gave the lookout.  Officer Phifer

22    apprehended the two passengers who were on the right side

23    because the air bag deployed, and nobody could make good the

24    escape from the driver's side other than the driver.

25           THE COURT:  Okay.

1              THE WITNESS:  He immediately had Darryl Ingram and

2     Mr. Faultz, who was the rear passenger, on the ground.  Upon

3     my arrival I saw Darryl Ingram laying on the ground by the

4     front --

5              THE COURT:  He says his name is Dorrell.

6              THE WITNESS:  Right.  Darryl was the front

7     passenger.  Dorrell was the driver.

8              THE COURT:  This defendant was the driver?

9              THE WITNESS:  Correct.

10             THE COURT:  Dorrell.

11             THE WITNESS:  Correct.

12             THE COURT:  And he has a twin, you say?

13             THE WITNESS:  Correct.  Darryl.  Correct.  He was

14    the front passenger.

15             THE COURT:  I see.

16             Hold it a second.

17             (Pause.)

18             THE COURT:  Darryl is the defendant's twin.

19             THE WITNESS:  Correct.

20             THE COURT:  Okay.

21             THE WITNESS:  Darryl was the front passenger, and

22    upon my arrival he was laying on the ground by the front

23    passenger right-side door.  Mr. Faultz, who was the rear

24    passenger, was laying by the rear passenger door and

25    complained of a broken leg and couldn't flee any further.

1          THE COURT:  Okay.  Hold it one second.

2          (Pause.)

3          THE COURT:  Mr. Faultz, you say?

4          THE WITNESS:  Correct.

5          THE COURT:  He was the rear seat passenger.

6          THE WITNESS:  Correct --

7          THE COURT:  In the --

8          THE WITNESS:  Crown Victoria.

9          THE COURT:  Okay.

10         THE WITENSS:  Immediately I looked and paid

11   attention to them.  I immediately advised Officer Phifer to

12   make a notation in his notebook of the description and the

13   names of the individuals and where they came from out of the

14   vehicles, which he did so.

15         THE COURT:  Okay.  Did you say the rear seat

16   passenger couldn't get out, right?

17         THE WITNESS:  He got out, but he couldn't flee.

18   He claimed a broken leg, but Officer Phifer grabbed the two

19   of them.

20         THE COURT:  And Darryl was --

21         THE WITNESS:  The front seat passenger.

22         THE COURT:  Just pulled out of the car?

23         THE WITNESS:  Correct.

24         BY MR. SOROKA:

25    Q    Officer, was -- Detective, excuse me, was anything

1  found in the green Crown Victoria subsequent to the arrest

2  of the three people --

3           MR. EDELMAN:  Objection, Your Honor, irrelevant.

4           THE COURT:  Overruled.  I'll overrule that.

5           THE WITNESS:  Yes.  Because of the collision scene

6  and the fatalities that were involved, the vehicle was

7  immediately taken in as evidence, and it was also learned

8  that that vehicle was stolen.  The ignition had been punched

9  and removed from the steering column and was on the front

10 floorboard of the vehicle along with a silver .380 Lorcin

11 semiautomatic handgun, which was fully loaded and one in the

12 chamber.

13      Q    I'm going to show you what's been marked as --

14           THE COURT:  It was found where?

15           THE WITNESS:  Front floorboard.

16           THE COURT:  When you say the floorboard, passenger

17 side or --

18           THE WITNESS:  Passenger side, correct.

19           BY MR. SOROKA:

20      Q    I am showing you what has been marked as

21 Government's 2, Government's 3 and Government's 4.  Looking

22 at the back of them, would you tell the Court what they are?

23      A    Number 2 is the front --

24           THE COURT:  These are photographs?

25           THE WITNESS:  Photograph.

13

1           It is a photograph of the striking vehicle, the

2    Crown Victoria, the stolen car.  It's a view of the front

3    end damage.

4           Number 3 is a photograph of the same vehicle

5    showing the air bag had been deployed on the driver's side,

6    and the air bag had been deployed on the passenger side, and

7    it shows damage to the right passenger side of the vehicle.

8           Photograph Number 4 is a picture of the front end

9    damage, again with the complete front end pushed to the

10   windshield.

11          BY MR. SOROKA:

12      Q   Now, are those photographs, are they -- where were

13   they taken; can you tell?

14      A   Those were taken at the Mobile Crime Lab.

15      Q   Are they a fair and accurate depiction of the way

16   the vehicle appeared on the scene?

17      A   Yes, they are.

18          MR. SOROKA:  Your Honor, I would move those into

19   evidence for this hearing, 2, 3 and 4.

20          MR. EDELMAN:  No objection.

21          THE COURT:  They will be received, Government's

22   Exhibits 2, 3 and 4.

23          (Government's Exhibits Nos. 2, 3 and 4 received in

24   evidence.)

25          THE COURT:  Indulge me one second.

1          (Pause.)

2          BY MR. SOROKA:

3     Q    And one final question, Detective.  Just for the

4  record, the person we have been talking about is Dorrell

5  Ingram.  Do you see him in the courtroom -- oh, let me ask

6  you this, two final questions:  Did you observe any injuries

7  on Mr. Dorrell Ingram on that day?

8     A    Yes, I did.  Over his --

9          THE COURT:  Excuse me one second.

10         THE WITNESS:  Over his front left eye there was a

11 noticeable mark which appeared to be a new injury.

12         THE COURT:  Front left eye?

13         THE WITNESS:  Correct, the forehead.

14         BY MR. SOROKA:

15    Q    Now, do you -- do you see the person we have been

16 talking about as Dorrell Ingram in the courtroom today?

17    A    Yes, I do.

18    Q    Would you point him out and identify him by an

19 article of clothing and where he is seated?

20    A    He's sitting towards my left in the orange

21 jumpsuit with the orange sneakers.

22         MR. SOROKA:  Your Honor, if the record would

23 reflect the in-court identification of Mr. Ingram?

24         MR. EDELMAN:  No objection.

25         THE COURT:  Yes.

1          MR. SOROKA:  No further questions.

2          THE COURT:  You may cross examine.

3          MR. EDELMAN:  Thank you, Your Honor.

4                    CROSS EXAMINATION

5          BY MR. EDELMAN:

6     Q    Good morning, Detective.

7     A    Good morning.

8     Q    Detective, let me tell you what reports I've been

9     given you authored.  In addition to the Gerstein, I have a

10    citation release determination report, the front page of a

11    PD-163, arrest prosecution report, a report written for the

12    Major Crash Investigations Unit, a PD-252, two different

13    PD-123 reports of investigations, and a PD-10 accident

14    report.  Other than those reports I just named, did you fill

15    out any other reports with regard to this incident?

16    A    None that I can recall.

17    Q    Now, the PD-163 that you filled out, did you fill

18    out both the front and back?  I have been handed the back.

19         The Court's indulgence one moment.

20         (Pause.)

21         BY MR. EDELMAN:

22    Q    Did you take any handwritten notes regarding this

23    incident?

24    A    There would be a sketch of the collision scene

25    that was taken on that day at the scene.

1        Q    Is that the sketch that appears in the PD-10, or

2    is that a different sketch?

3        A    No.  That would be a different one.

4        Q    All right.  Anything other than that sketch?

5        A    Not that I can recall.

6        Q    Did you broadcast anything over the radio

7    regarding this incident?

8        A    I just asked for additional units from my Major

9    Crash Unit to come assist me due to the chaos on the scene

10   and the two loss of lives.  I needed help.

11           MR. EDELMAN:  Pursuant to the Jenks Act, Your

12   Honor, I would request the sketch.  I don't want to hold up

13   the hearing waiting for it.  What I would just ask for the

14   Government to be able to produce that within five business

15   days.  If I need to reopen, I will make that request.

16           MR. SOROKA:  That would be fine.

17           THE COURT:  Okay.  Unless you happen to have it

18   with you.

19           THE WITNESS:  Yes, I do.  However, I don't have a

20   photocopy of it, and he can't have my original.

21           THE COURT:  He just wants to take a look at it

22   right now, and then the Government can make a copy of it

23   later on and give it to him so he can use it for cross

24   examination.

25           THE WITNESS:  May I get down to get it?

1          THE COURT:  Sure.

2          And then, Mr. Soroka, if you could later make a

3    copy of that?

4          MR. SOROKA:  Sure, Your Honor.  I will do that

5    today.

6          (Pause.)

7          MR. SOROKA:  She says that she didn't do the

8    diagram, it was Detective Miller.

9          THE COURT:  She didn't do it, okay.

10         (Pause.)

11         THE WITNESS:  I apologize.  I forgot we switched

12   at the scene.

13         THE COURT:  Okay.  So, the diagram was done by

14   Detective --

15         THE WITNESS:  Miller.  Michael Miller.

16         THE COURT:  Michael Miller.

17         MR. EDELMAN:  Thank you.

18         THE COURT:  Um-hum.

19         BY MR. EDELMAN:

20    Q    So, based on your testimony, it's my understanding

21   that your testimony about what happened once you got to the

22   scene is based on your personal observations, correct?

23    A    And also monitoring the radio.

24    Q    All right.  You're -- what you are able to testify

25   to about what happened during the chase of the car and the

1    crash itself, that's based on your interview with other

2    officers?

3        A    No, not in whole.  I was already in the Sixth

4    District working overtime and monitoring the radio.

5        Q    So -- well, I will break it down bit by bit, but

6    it is fair to say you didn't observe the chase or the crash,

7    right?

8        A    No.

9        Q    Now, the officers who first approached the Crown

10   Victoria had received information that there was a car that

11   had been involved in an earlier hit-and-run that day; is

12   that correct?

13       A    Kind of, sort of.

14       Q    What do mean by kind of, sort of?

15       A    The lookout was for a green vehicle, but the

16   lookout was also for the individuals that had been in the

17   original striking vehicle.

18       Q    Okay.  When did that accident occur, the earlier

19   accident?

20            THE COURT:  Say that again now?  There had been a

21   lookout --

22            THE WITNESS:  Not only was there a lookout for the

23   green vehicle --

24            THE COURT:  Yes.

25            THE WITNESS:  -- but the informant also gave

1    information that it knew who had been in the vehicle when it

2    struck the children.

3            THE COURT:  Right.  Okay.

4            BY MR. EDELMAN:

5      Q    When did that earlier accident occur?

6            THE COURT:  The children were in a vehicle or

7    pedestrians?

8            THE WITNESS:  They were pedestrians.

9            It was right after school had let out, so I would

10   say probably about 4:00 o'clock in the evening.

11           BY MR. EDELMAN:

12      Q   And do you know where that occurred?

13      A   I'll say the 4800 block of Foote.

14      Q   All right.  Foote Street NE?

15      A   As to the best I can recall.

16           THE COURT:  Hold it one second.  It was a

17   hit-and-run?

18           THE WITNESS:  Yes, it was, of three children.

19           THE COURT:  Okay.

20           BY MR. EDELMAN:

21      Q   Did you subsequently learn that the Crown Victoria

22   had not been involved in that earlier accident?

23      A   It hasn't been ruled out yet.

24      Q   All right.  You received information that there

25   was another car --

1          A    That's correct.

2          Q    -- that was involved in that accident?

3          A    And that's still under investigation also.

4    Neither one have been ruled out.

5          Q    What information do you have about the other car?

6          A    Other than it was green and, I believe, a Grand

7    Marquis.

8               THE COURT:  Hold it one second.

9               (Pause.)

10              THE COURT:  I'm just looking at the Gerstein.  It

11   looks like the green Crown Victoria was the car --

12              THE WITNESS:  Um-hum.

13              THE COURT:  -- that allegedly struck the children,

14   and the same car that later was involved in this crash up at

15   49th and what did you say, 49th and --

16              THE WITNESS:  Sheriff.

17              THE COURT:  -- Sheriff Road.  I don't see any

18   indication that there was a second car.  Do you have your

19   Gerstein in front of you?

20              MR. SOROKA:  I have it here.

21              THE WITNESS:  Can I explain it to you, sir?

22              THE COURT:  Hold on just a second.  Let me review

23   it myself.

24              THE WITNESS:  It's not in there.  The part that

25   his attorney is getting at isn't in the Gerstein completely.

1    THE COURT:  Oh, okay.

2    THE WITNESS:  He is going back and starting from

3    the very beginning.

4    MR. EDELMAN:  I am trying to establish to the

5    extent that there is information in there that suggests the

6    Crown Victoria was involved in the earlier accident, but

7    there is also information that that was caused by a

8    different vehicle, all right?

9    THE COURT:  There certainly is information in this

10   Gerstein that indicates that the Crown Victoria had -- was

11   the hit-and-run car involving the three kids and the same

12   car that broad-sided this car up at 49th and Sheriff Road.

13   MR. EDELMAN:  That's what I am seeking to inquire

14   about, all right?

15   THE COURT:  First of all, am I reading this

16   correctly; is that what this indicates?

17   THE WITNESS:  Yes.  It is a suspect vehicle.  We

18   don't -- at the time that it started, it wasn't known

19   whether or not for sure that was the vehicle.

20   THE COURT:  Okay.

21   BY MR. EDELMAN:

22   Q    What information do you presently have that

23   suggests that the Crown Victoria was the car that was

24   involved in the first accident with the kids?

25   A    Officer Bigelow received a call on his cell phone,

1    and he was advised by an individual who witnessed the

2    earlier accident with the three children that the vehicle

3    was now in the 4200 block of Edson with the individuals that

4    were in the original striking vehicle.  That caller led the

5    officers to believe that it was a Crown Victoria, which,

6    when they drove into the block, found the green Crown

7    Victoria.

8          Q    All right.  Have you talked to Officer Bigelow

9    about that call?

10         A    No, I haven't.

11         Q    Do you know whether the person who called Officer

12   Bigelow -- where they supposedly saw that accident from?

13         A    They were within view of the vehicle speeding

14   away, from what I can recall.  Where they were exactly, I do

15   not know.

16              THE COURT:  And did you say that person indicated

17   that it knew the occupants of that green car that struck the

18   children?

19              THE WITNESS:  Correct, correct.

20              THE COURT:  All of the occupants or just one or

21   two of them?

22              THE WITNESS:  I don't know.  I don't know.

23              THE COURT:  Okay.  Go ahead.

24              BY MR. EDELMAN:

25         Q    In addition to that, did you subsequently learn

1    information indicating that another car may have been

2    involved in that earlier accident?

3         A    Yes, I did.  The caller advised --

4              THE COURT:  Same caller?

5              THE WITNESS:  Correct.

6              The caller advised that after striking the three

7    children, they dumped the vehicle and got the green Crown

8    Victoria, and once they got the green Crown Victoria, it

9    called to advise that the suspects were in the green Crown

10   Victoria.

11             THE COURT:  Oh.  Wait a minute.

12             (Pause.)

13             BY MR. EDELMAN:

14        Q    According to --

15             THE COURT:  Hold it.

16             (Pause.)

17             THE COURT:  I assume it pulled away from the scene

18   where it struck the kids before that car was dumped.

19             THE WITNESS:  Correct.  It was a hit-and-run.

20             THE COURT:  That striking car was dumped, and the

21   green car entered in its stead by the striking folks.

22             THE WITNESS:  Correct.

23             THE COURT:  After striking the children, the

24   striking car was dumped, and the occupants thereupon entered

25   the green car.

1          THE WITNESS:  Correct, the Crown Victoria.

2          THE COURT:  Right.  Okay.

3          BY MR. EDELMAN:

4     Q     According to the person, calling the person

5     witness 1, did -- after the -- how soon after the accident

6     did the individuals go from the Marquis into the Crown

7     Victoria?

8     A     I don't know.  It advised that it knew the

9     individuals would be back around because that was their

10    modus operandi, they steal cars.

11    Q     According to --

12         THE COURT:  Hold it one second.

13         (Pause.)

14         THE COURT:  Okay.

15         BY MR. EDELMAN:

16    Q     According to this witness, witness 1, did the

17    individuals get out of the Marquis and get directly into the

18    Crown Victoria?

19         THE COURT:  Marquis.  Did you say the first car

20    was supposedly a Marquis?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.

23         THE WITNESS:  Possibly.

24         THE COURT:  Possibly.

25         THE WITNESS:  As we were told by Officer Bigelow,

1    he received the call from W-1 and advised that that vehicle

2    was in the 4200 block of Edson.  I have no information on

3    whether or not that caller saw them switch cars or can

4    identify the people in the first car as being all of the

5    same people in the second car.

6          BY MR. EDELMAN:

7    Q    All right.  You don't know whether this caller

8    would say that Mr. Ingram was in the Marquis at the time

9    that it struck the kids; is that correct?

10    A    I don't have firsthand knowledge of that, no.

11    Q    All right.  And you don't know that -- I guess

12    included in that you don't know whether that person would

13    say Mr. Ingram was driving the car at the time that it hit

14    the kids either?

15    A    No, I don't know.

16    Q    All right.  Now, have you spoke to -- strike that.

17          In your Gerstein you talk about some things that

18    happened when the police attempted to stop the car on Edson;

19    is that correct?

20    A    Correct.

21    Q    How did you learn the information in the Gerstein

22    about what happened when the police attempted to stop the

23    Crown Victoria on Edson?

24    A    I was advised by the officer, Officer Taylor,

25    whose vehicle was struck by the striking Crown Victoria, and

1    also by the radio transmissions.

2         THE COURT:  I'm sorry, whose car was struck by

3    the --

4         THE WITNESS:  Lester Taylor.

5         THE COURT:  Scout car?

6         THE WITNESS:  Correct.  He was scout 81, but

7    utilizing scout car 82 -- 6082.

8         THE COURT:  Now, did they stop the Crown Victoria

9    and were approaching it to question the people, and the car

10   took off?  Is that how it struck the officer's car?  How did

11   that come about?

12        THE WITNESS:  Officer Taylor attempted to speak to

13   the driver, however --

14        THE COURT:  After alighting from his car; Taylor?

15        THE WITNESS:  He started to come out of the

16   vehicle.  He opened the door, drew his weapon.

17        THE COURT:  Okay.

18        THE WITNESS:  And the driver, Mr. Dorrell Ingram,

19   threw the car in drive, rammed a car, couldn't --

20        THE COURT:  Rammed the police car?

21        THE WITNESS:  A parked car.

22        THE COURT:  Parked car.

23        THE WITNESS:  Couldn't get out, threw it in

24   reverse, then rammed the police car, rendering it

25   inoperable, and fled the scene.

1          THE COURT:  Okay.  The officer was just in the

2     process of getting out of the car.

3          THE WITNESS:  He had started to open the door or

4     window and was verbally trying to communicate with the

5     driver.

6          THE COURT:  Okay.  That driver was this defendant,

7     you say?

8          THE WITNESS:  Correct.

9          THE COURT:  As well as a parked car.

10         BY MR. EDELMAN:

11     Q    Let me back that up a little bit, Detective.

12     According to Officer Taylor, when did Officer Taylor arrive

13     in the 4400 block of Edson Place?

14     A    Officer Bigelow had requested units to respond to

15     the location of where the suspect vehicle was.

16     Q    And do you know what time that was?

17     A    No more than three minutes before the fatal

18     collision.

19     Q    All right.  So, we are talking then about sometime

20     around 9:30 at night also?

21     A    Correct.

22     Q    All right.  According to Officer Taylor, where was

23     the Crown Victoria when Officer Taylor arrived on the block?

24     A    I don't know where exactly in the block it was.

25     Q    I guess my question is according to Officer

1  Taylor, was the Crown Victoria parked, or was it in the

2  street?

3       A    It was in the street.

4       Q    According to Officer Taylor, what was the Crown

5  Victoria doing when Officer Taylor first arrived?

6       A    I don't know.

7       Q    All right.  Do you know, according to Officer

8  Taylor, whether the engine was on or off on that car?

9       A    I don't know if it was on or off.

10       Q    All right.  According to Officer Taylor, was

11  Officer Taylor able to observe how many people were in the

12  car when Officer Taylor arrived?

13       A    I don't know.

14       Q    Do you know whether Officer Taylor was able to

15  identify who the driver was as opposed to the passengers?

16       A    I don't know.

17       Q    Do you know whether Officer Taylor provided any

18  descriptions of --

19            THE COURT:  Wait, wait, wait.  Who was it, if you

20  don't know whether Taylor -- who was it you said a minute

21  ago that this --

22            THE WITNESS:  Officer Hodges, Herman Hodges.

23            THE COURT:  Identified this defendant as being the

24  driver of the car?

25            THE WITNESS:  That's correct.

29

1          THE COURT:  On Edson Place?  Not at the scene of

2     the crash.

3          THE WITNESS:  No, at the scene.

4          THE COURT:  I think he was asking about Edson

5     Place, right?

6          MR. EDELMAN:  That's correct.

7          THE WITNESS:  Oh, I don't know.

8          THE COURT:  Are your answers the same, or were you

9     thinking about the scene?

10         THE WITNESS:  I was thinking about the scene.  I

11    don't know --

12         THE COURT:  You two weren't on the same page then.

13         MR. EDELMAN:  I don't think so.

14         THE COURT:  Why don't you go back again.

15         BY MR. EDELMAN:

16    Q     Officer Taylor -- was there any other officer on

17    the scene other than Officer Taylor --

18         THE COURT:  By the scene, are you talking about

19    the --

20         BY MR. EDELMAN:

21    Q     The scene of the first collision we are talking

22    about, the crash involving the police car.

23    A     Yes, there was, but I don't know who it was.

24    Q     Okay --

25         THE COURT:  Now, did anybody identify this

1    defendant as being the driver of that car that rammed the

2    police car and sped off?

3             THE WITNESS:  I have no knowledge.  I have no

4    knowledge.

5             THE COURT:  All right.

6             BY MR. EDELMAN:

7     Q    According to Officer Taylor, what did Officer

8    Taylor do when Officer Taylor arrived in the 4400 block of

9    Edson Place?

10     A    The Court's indulgence, for a moment.

11             THE COURT:  Uh-huh.

12             (Pause.)

13             THE WITNESS:  Can you restate your question?

14             BY MR. EDELMAN:

15     Q    According to Officer Taylor, what did Officer

16    Taylor do when Officer Taylor arrived in the 4400 block of

17    Edson Place?

18     A    Officer Taylor observed the vehicle, which was

19    occupied three times, a seat passenger, one rear-seat

20    passenger, and the driver.

21             THE COURT:  Occupied by three persons?

22             THE WITNESS:  Correct.  I have the information

23    from my Gerstein.

24             BY MR. EDELMAN:

25     Q    And what did Officer Taylor do with regard to that

1   car when he arrived?

2       A    He attempted to speak to the driver.  He opened

3   the door to his cruiser, drew his revolver, and ordered the

4   driver to put his hands where he could see them.

5       Q    According to Officer Taylor, how did Officer

6   Taylor pull Officer Taylor's car in regard to where the

7   Crown Victoria was?

8       A    I didn't ask.

9       Q    So, you don't know whether Officer Taylor is

10  behind the Crown Victoria, in front of it or to the side of

11  it?

12      A    No, I don't.

13          THE COURT:  Did anybody -- you say he got close

14  enough to tell the man, put your hands where I can see

15  them --

16          THE WITNESS:  Correct.

17          THE COURT:  -- talking to the driver.  Has anybody

18  ever asked him to identify who this driver was, Taylor that

19  is?

20          THE WITNESS:  The initial first accident is not my

21  investigation.  I'm strictly the fatalities, so I would have

22  had no need to ask Officer Taylor if he could identify the

23  driver at that time because we had the driver identified

24  from the fatalities.

25          THE COURT:  Okay.

1          MR. EDELMAN:  All right.

2          BY MR. EDELMAN:

3      Q     According to Officer Taylor, Officer Taylor said

4   to the driver --

5          THE COURT:  In determining detention, the Court

6   would be taking into consideration all of the circumstances

7   involving this driver if they are known.  So, do you have

8   any witnesses here who are going to talk about the

9   hit-and-run with the kids or whether or not there is clear

10  and convincing evidence of danger?  It is one thing if you

11  just talk about a fatality at 49th and Sheriff Road.  It is

12  another thing if you are talking about ramming police cars

13  and ramming parked cars plus hit-and-run after striking

14  three kids.  But all I'm hearing is, I don't know.

15         MR. SOROKA:  As far as the other -- as far as the

16  earlier incident, Your Honor, the one that happened with the

17  three kids, I had no intention of putting on any evidence

18  about that because, as I said, we simply do not have any

19  information.

20         I think if I were to ask a couple of questions

21  about the continuity of the car and the crash, I might be

22  able to clear up if there was substantial probability, but I

23  will do that on redirect.

24         THE COURT:  Okay.

25         BY MR. EDELMAN:

1          Q    According to Officer Taylor, Officer Taylor told

2     the driver of this car to put his hands up?

3          A    To put them where he could see them.

4          Q    And according to Officer Taylor, what did the

5     driver say or do at that point?

6          A    The driver did not comply, and the driver

7     attempted to flee by striking a parked vehicle first and

8     then rammed the marked police car and fled the scene.

9          Q    According to Officer Taylor, how close was Officer

10    Taylor to the car when Officer Taylor gave that command?

11         A    Again, that is not part of my investigation, and I

12    had no reason to ask.

13         Q    All right.  And you don't know; is that fair to

14    say?

15         A    Yes.

16              THE COURT:  So, you don't know if he was still in

17    his car or out of his car; Taylor, that is?

18              THE WITNESS:  As I stated, and as it is in the

19    Gerstein, he opened the door of his cruiser, drew his

20    revolver.  Whether he was in the car or still in the car, I

21    don't know.

22              THE COURT:  Do you know whether he was injured,

23    because if he was still in the car and his car was rammed by

24    the driver, whoever it was that tried to get away --

25              THE WITNESS:  Officer Taylor complained of no

1    injuries.  The car was just rendered inoperable.

2                THE COURT:  His car was rendered inoperable?

3                THE WITNESS:  Yes, the scout car.

4                THE COURT:  All right.  Hold it one second.

5                (Pause.)

6                THE COURT:  Okay.

7                BY MR. EDELMAN:

8        Q    Officer Taylor did tell you that Officer Taylor

9    had drawn his gun; is that correct?

10       A    It was advised to me through his written

11   statement.

12       Q    All right.  And in his written statement did

13   Officer Taylor indicate whether he pointed that gun at the

14   occupants of the car?

15       A    Didn't ask.  I don't know.

16       Q    You don't know?  Do you know anything else about

17   the circumstances of Officer Taylor drawing his gun?

18       A    I don't know anything other than what I've said

19   about the initial first collision.

20       Q    All right.  According to what you learned, there

21   was another officer also on Edson Place at that time?

22       A    Yes.

23       Q    Do you know whether that officer drew his or her

24   gun?

25       A    There was no mention of it.

1      Q     All right.  According to what you've learned,

2   where was the police car damaged, where on the police car?

3      A     The front.

4      Q     The front.

5            Do you know exactly how that collision occurred?

6      A     Again, the striking vehicle backed up and rammed

7   the police car, and the damage to the police car was the

8   front fender; however, it was more to the driver's side.

9      Q     Was your understanding that the Crown Victoria

10  backed up and hit the police car?

11     A     That's correct.

12     Q     All right.  So, it wasn't that the Crown Victoria

13  went towards the police car and rammed it and drove past it?

14     A     Correct.

15     Q     Is that correct?  All right.

16           Do you know --

17           THE COURT:  How did it strike this parked car?

18           THE WITNESS:  It went forward first.  My

19  understanding is Officer Taylor was towards the rear.  The

20  second officer that came in the block was towards the front.

21  There wasn't enough room because of parked cars, so the

22  driver tried to go forward first, rammed the car in front of

23  him, the parked car, couldn't go anywhere, so then threw it

24  in reverse, rammed the police cruiser, had enough room to

25  flee.

```
 1              THE COURT:  I see.  After ramming a parked car

 2      frontally --

 3              THE WITNESS:  Correct.  And then into reverse and

 4      hit the police car.

 5              BY MR. EDELMAN:

 6          Q   According to Officer Taylor, where did the Crown

 7      Victoria go after striking the police car?

 8          A   The Court's indulgence.

 9              (Pause.)

10              THE COURT:  Just according to Taylor or according

11      to anybody?

12              BY MR. EDELMAN:

13          Q   Start with Taylor.

14          A   I don't know.  He --

15          Q   Go ahead.

16          A   He broadcast a lookout for the vehicle.  That is

17      all I know.

18          Q   Okay.  Do you know from any information that you

19      have where the Crown Victoria went after it hit the police

20      car?

21          A   I don't have the exact route it went.

22          Q   All right.  According -- did you hear the

23      broadcast that Officer Taylor made after the collision?

24          A   Bits and pieces, because I was on a priority call

25      myself.
```

1      Q    Do you know what description Officer Taylor gave

2    of the occupants of the car?

3      A    I don't recall a description of the occupants.  It

4    was a description of the vehicle.

5      Q    All right --

6          THE COURT:  You said in your Gerstein two other

7    marked police units located the car matching the

8    description --

9          THE WITNESS:  Correct.

10          THE COURT:  -- and attempted to stop the vehicle

11    by using lights and sirens?  How long was that after the

12    lookout had been broadcast by Officer Taylor?

13          THE WITNESS:  Seconds.

14          THE COURT:  Within seconds.

15          Hold it -- hold it one second.

16          (Pause.)

17          THE COURT:  And those -- it says that those marked

18    units followed the green Ford at a distance of approximately

19    one block as it fled at a high rate of speed.

20          THE WITNESS:  Correct.

21          THE COURT:  Did those vehicles follow the green

22    car up to the point of this collision at 49th and Sheriff

23    Road?

24          THE WITNESS:  Yes, yes.

25          THE COURT:  Okay.

```
 1              All right.  Hold it one second.

 2              (Pause.)

 3              THE COURT:  So, they were still pursuing it at the

 4    time of this collision?

 5              THE WITNESS:  Correct.

 6              THE COURT:  You said 49th and Sheriff Road?

 7              THE WITNESS:  Correct.

 8              THE COURT:  Okay.

 9              BY MR. EDELMAN:

10       Q    All right.  You said the next time police officers

11    saw the Crown Victoria was seconds after the lookout was

12    broadcast?

13       A    Correct.  The two units had already started to the

14    original location of the first collision.

15              THE COURT:  You mean the collision with the

16    Officer Taylor's car?

17              THE WITNESS:  Correct.

18              BY MR. EDELMAN:

19       Q    When you say seconds, are we talking about three

20    or four seconds, are you talking about 30 seconds, a minute;

21    do you have any estimation on that?

22       A    No, I don't.

23       Q    All right.  Do you know where the Crown Victoria

24    was the next time it was spotted by those two units?

25       A    The Court's indulgence.
```

1           (Pause.)

2           THE WITNESS:  No, not offhand.

3           BY MR. EDELMAN:

4      Q    You spoke to the officers who next saw the Crown

5    Victoria; is that correct?

6      A    Correct.

7      Q    And you said those were Officers Phifer and

8    Hodges; is that correct?

9      A    Correct.

10     Q    All right.  According to those officers, what did

11   those officers do when they saw the Crown Victoria?

12     A    They immediately fell in behind the vehicle with

13   lights and sirens and attempted to stop the vehicle;

14   however, it refused to stop and continued at a high rate of

15   speed.  The officers remained approximately a block --

16   Phifer remained approximately a block behind.  Officer

17   Hodges remained approximately a block and a half behind the

18   vehicle.  And they followed the vehicle and gave the

19   location of the vehicle as it passed different

20   intersections.

21           THE COURT:  Excuse me one second.  You said they

22   fell in behind the vehicle.  Were their lights and sirens

23   on?

24           THE WITNESS:  Correct.

25           THE COURT:  And you said tried to stop it by

1    doing --

2            THE WITNESS:  By initiating the lights and sirens.

3            THE COURT:  Oh, okay.

4            THE WITNESS:  You are required by law to pull over

5    to the right.  The vehicle didn't.

6            THE COURT:  It didn't do so.

7            THE WITNESS:  No.

8            THE COURT:  And I think you said at a high rate of

9    speed.

10           THE WITNESS:  Correct.

11           THE COURT:  What is the highest rate of speed that

12   anybody estimated this car was going prior to the fatal

13   crash?

14           THE WITNESS:  Per the officers, 60 miles per hour.

15           THE COURT:  In a what zone?

16           THE WITNESS:  25.

17           (Pause.)

18           THE COURT:  Okay.

19           BY MR. EDELMAN:

20      Q    All right.  Officer Phifer and Officer Hodges were

21   in separate cars; is that correct?

22      A    Correct.

23      Q    Officer Phifer was approximately one block behind

24   the Crown Victoria?

25      A    Correct.

1    Q    And then Hodges was half a block behind Phifer?

2    A    Correct.

3    Q    All right.  During the chase, during the

4    collision, were they ever closer than that prior to the

5    collision?

6    A    I didn't ask.

7    Q    Your understanding from what they told you,

8    though, was the distances were a block and a block and a

9    half respectively?

10    A    Correct.

11    THE COURT:  Phifer was one officer, and what was

12    the other officer's name?

13    THE WITNESS:  Hodges.

14    THE COURT:  Oh.

15    BY MR. EDELMAN:

16    Q    Did you learn how the officers made the estimate

17    of 60 miles an hour?

18    A    I believe Officer Phifer is radar-certified, which

19    would require him to be able to estimate speeds within five

20    miles under or over the posted speed limit.

21    Q    So, it was based on Officer Phifer's visual

22    estimation of how fast the car was going?

23    A    Correct, correct.

24    Q    All right.  Was another estimate given at the time

25    of the collision the vehicle was going 30 miles an hour?

1          A      At one point it had been doing 30.   Phifer, I

2     believe, advised that he was doing 30 at one point.   The

3     speeds escalated.

4          Q      Okay.   So, according to Officer Phifer, initially

5     the car was going 30 miles an hour?

6          A      According to Phifer, he was doing 30 miles an

7     hour.

8          Q      All right.   According to Officer Phifer, did

9     Officer Phifer say at the time of the collision the Crown

10    Victoria was still going 60 miles an hour?

11         A      I didn't ask for verification.

12         Q      All right.   The collision itself occurred right at

13    the intersection of 49th and Sheriff?

14         A      Correct.

15         Q      According to Officers Phifer and Hodges, how long

16    had they been chasing the Crown Victoria prior to the

17    collision?

18         A      From when they first picked it up until the Crown

19    Victoria ran the red light and struck the vehicle in the

20    intersection.

21              THE COURT:   Of 49th and Sheriff Road?

22              THE WITNESS:   Correct.

23              BY MR. EDELMAN:

24         Q      All right.   Do you have any idea what distance

25    that is in terms of how many blocks?

1        A    Eight-tenths of a mile.

2        Q    Eight-tenths of a mile?

3             According to the officers, the Crown Victoria was

4    facing a solid red signal as it drove up Sheriff toward

5    49th, correct?

6        A    Correct.

7        Q    All right.

8             THE COURT:  It was on Sheriff Road --

9             THE WITNESS:  Correct.

10            THE COURT:  -- the Crown Victoria?

11            BY MR. EDELMAN:

12       Q    According to the officers, did the Crown Victoria

13   slow down at all before going through the intersection?

14       A    Made no attempt.

15       Q    Okay.  No attempt to slow down, correct?

16       A    Correct.

17       Q    According to what you've learned, where in the

18   intersection did the collision occur?

19       A    Mr. Robinson's vehicle had the right of way, was

20   already in the intersection, had cleared almost the entire

21   intersection, and was struck.

22            THE COURT:  He was traveling on 49th Street?

23            THE WITNESS:  Correct.

24            If he had three seconds more, he would have

25   cleared the intersection.

1          BY MR. EDELMAN:

2      Q     After the -- from your testimony it's my

3   understanding the front end of the Crown Victoria hit the

4   passenger side of the Maxima; is that correct?

5      A     Correct, the entire passenger side of the vehicle.

6      Q     According to what you learned, what happened to

7   the Crown Victoria after the collision?

8      A     It was inoperable, and I believe it was stuck on

9   the sidewalk or up next to the sidewalk.  The occupants were

10  dazed and tried to make do their -- they tried to flee from

11  the scene.

12     Q     Okay.  That is what I want to ask about now.

13  According to Officers Phifer and Hodges, how far back were

14  the police cars when the collision occurred?

15     A     Officer Phifer was approximately a block behind.

16  Officer Hodges was approximately a block and a half.

17  However, when the collision occurred, they are still moving

18  forward and coming closer to the impact.

19     Q     Okay.  So, your understanding is that Officer

20  Phifer actually saw the collision from around 48th and

21  Sheriff Road; is that correct?

22     A     Within the block.

23     Q     Within the block.

24          According to Officers Phifer and Hodges, how long

25  after the collision did they see anyone get out of the car?

1     A     They were -- Officer Phifer's car was stopped

2     maybe six feet from the Crown Victoria.  As he is pulling up

3     on the scene, the driver is exiting the vehicle.

4     Q     Okay.  According to Officer Phifer, Officer Phifer

5     actually saw someone get out of the driver's side of the

6     car?

7     A     Both of them did.

8     Q     Okay.  When you said both of them --

9     A     Hodges.

10     Q     Both officers saw?

11     A     Correct.

12     Q     Both officers saw someone get out of the front

13     driver's side; is that correct?

14     A     Correct, the driver's side.

15     Q     Is it a four-door car or a two-door car?

16     A     Four-door.

17     Q     According to these officers, did they also see

18     anyone else get out of the car?

19     A     The front seat passenger, Darryl Ingram, and the

20     rear seat passenger, Mr. Faultz, were attempting to begin to

21     exit the vehicle, and Officer Phifer was able to grab them.

22     Q     Okay.  In other words, according to Officer

23     Phifer, were those two other individuals able to get out of

24     the car at all before they were grabbed by the police?

25     A     They had started to exit.

1      Q   Okay.  According to Officer Phifer, what doors

2  were they coming out of?

3      A   Darryl Ingram was coming out of the front

4  passenger's, and Mr. Faultz was coming out of the rear

5  passenger's right side.

6      Q   You mentioned earlier that the air bag had

7  deployed on the front driver's side; is that correct?

8      A   Correct.

9      Q   And you mentioned earlier that as a result of

10  that, the other people were unable to get out of the car

11  through that door; do you recall that?

12      A   I didn't say the door.  In order to -- in order

13  for the front passenger to try to get out the driver's side,

14  he would have had to punch the air bag and let it deflate.

15      THE COURT:  I'm sorry, in order for what?

16      THE WITNESS:  If somebody on the passenger side

17  was going to try to go out the driver's side, he would have

18  had to deflate the air bag first.  It was still deployed.

19  So, only the driver would have enough room to get out.

20      BY MR. EDELMAN:

21      Q   According to --

22      THE COURT:  So, the driver did get out, you said,

23  and fled?

24      THE WITNESS:  Correct.

25      THE COURT:  And Darryl Ingram exited the passenger

1  side?

2  THE WITNESS:  Correct.

3  THE COURT:  Okay.

4  BY MR. EDELMAN:

5  Q  According to Officers Phifer and Hodges, did

6  Darryl Ingram and the man in the back attempt to get out of

7  the driver's side?

8  A  No.

9  Q  They weren't able to, or they got out the other

10  side?

11  A  They got out their respective sides.

12  THE COURT:  The person in the rear, was he seated

13  in the rear left or rear right?

14  THE WITNESS:  I don't know, but he exited the rear

15  right.

16  THE COURT:  The rear right, okay.

17  BY MR. EDELMAN:

18  Q  According to Officer Phifer, how close was Officer

19  Phifer to the driver of the car when the driver got out?

20  A  Where he could visibly see him, identify his

21  clothing and attempt to grab him.

22  Q  Did he give you an estimate as to how many feet

23  that was?

24  A  I didn't ask.

25  Q  According to Officer Phifer and Hodges, what did

1    the driver do when the driver got out of the car?

2         A    Phifer attempted to grab him.  He fled the scene.

3    Both Phifer and Hodges gave a brief lookout of the driver

4    who fled and advised that it was the driver who fled.

5              THE COURT:  And advised that it was the driver who

6    fled, and then they gave foot chase?

7              THE WITNESS:  Officer Hodges did, and Officer

8    Purnell, who arrived on the scene shortly afterwards, gave

9    foot chase, and they located him underneath a front porch.

10             THE COURT:  How far away?

11             THE WITNESS:  .That I'm not sure.

12             BY MR. EDELMAN:

13        Q    Did you hear the lookout that was broadcast after

14   the driver got out of the car?

15        A    I caught bits and pieces because I was on my own

16   priority call.  Beige coat is what I recall.

17        Q    Do you recall anything other than that?

18        A    No.

19        Q    According to Officer Hodges, did Officer Hodges

20   ever lose sight of the driver when he was chasing him?

21        A    When he got into the woods.

22        Q    Officer Hodges lost sight of him?

23        A    Yes.

24        Q    For how long did Officer Hodges lose sight of him?

25        A    I don't know how long.  Officer Purnell was also

1    in foot pursuit, and he jumped a fence.

2            THE COURT:  He, meaning the defendant?

3            THE WITNESS:  The defendant jumped a fence.  They

4    lost sight of him, and then apparently he was walking down

5    49th Street or 50th Street, I don't recall, and hid

6    underneath a porch.

7            BY MR. EDELMAN:

8    Q    According to these officers --

9            THE COURT:  Hold it one second.

10           Are you saying the officers recognized this as

11   being the same person they had been chasing?

12           THE WITNESS:  Yes, because of the lookout.

13   Officer Hodges had given a lookout, and Officer Phifer gave

14   a lookout.  Hodges knew what he was looking for, and the

15   individual that they had located had injuries to his --

16   fresh injuries to his face and grass in his hair.

17           THE COURT:  Okay.  As he walked down --

18           THE WITNESS:  Correct.

19           THE COURT:  -- what, 49th or 50th?  Anyway, one of

20   those streets.

21           THE WITNESS:  Uh-huh.

22           THE COURT:  And what about the porch --

23           THE WITNESS:  At one point he was trying to hide

24   underneath the porch.

25           THE COURT:  He had grass --

1            THE WITNESS:  Correct.  He had grass and debris in

2   his hair and about his body.

3            THE COURT:  You said fresh cuts or something?

4            THE WITNESS:  Correct.  There was a -- the mark

5   that I referred to earlier over his left eye on the

6   forehead, and apparently there looked to be scars on his

7   eyelids.

8            THE COURT:  Okay.

9            BY MR. EDELMAN:

10      Q     According to what you learned, how much time

11  passed between the collision and when Mr. Ingram was

12  arrested under the porch?

13      A     I arrived on the scene before the fire board did.

14            THE COURT:  Arrested on the porch?

15            MR. EDELMAN:  Under the porch.

16            THE COURT:  Under the porch, oh.  That's where he

17  was when he was arrested?

18            THE WITNESS:  He had left the porch, my

19  understanding.  It was either under the porch, or he was

20  starting to get out.

21            THE COURT:  Started to leave.

22            BY MR. EDELMAN:

23      Q     The time between the collision and the arrest is

24  what I was looking for.

25      A     The Court's indulgence.

1          (Pause.)

2          THE WITNESS:  I arrived on the scene while the

3     decedents were still in the vehicle, and they had announced

4     over the radio that they had located the driver and placed

5     him under arrest.  I would say no more than five minutes.

6          BY MR. EDELMAN:

7     Q     Okay.  And how long after the accident did you

8     arrive on the scene?

9     A     Within minutes.

10    Q     Now, did you personally observe the inside of the

11    Crown Victoria after the collision?

12    A     To some degree, yes.

13    Q     Okay.  You said there was some damage to the

14    steering column of the car; is that correct?

15    A     Correct.

16    Q     Could you describe that damage?

17    A     The ignition was punched, and the little piece

18    that you put your key into with the two pieces of silver and

19    then you turn it was completely detached from the steering

20    column and was on the floorboard.

21    Q     Okay.  Was there any key in the steering column at

22    all?

23    A     No.  There was nothing in the steering column, but

24    there was a key that didn't fit properly into the ignition

25    switch in the ignition that was laying on the floor.

1        Q    All right.  That's what I was asking.  There was a

2    key that was inside of the ignition switch?

3        A    Correct, but it wouldn't go all the way in.

4        Q    All right.  And that is a way that someone can

5    start a car once the ignition has been punched; is that fair

6    to say?

7             THE COURT:  The key -- the key was on the floor?

8             THE WITNESS:  Correct.

9             BY MR. EDELMAN:

10       Q    Have you investigated stolen car cases before?

11       A    Yes, I have.

12       Q    Can you make a conclusion as to how that car was

13   started?

14       A    They broke the ignition and probably used a

15   screwdriver to hit the ignition switch inside the steering

16   column and started it.  No, that key did not start the car.

17       Q    You don't think that that key could have been used

18   the same way the screwdriver was used?

19       A    No.

20       Q    All right.  Do you know when this car was reported

21   stolen?

22       A    I'm not sure if it was earlier that day or the day

23   before, but it was recent.

24       Q    Your memory of it, though, was either earlier in

25   the day or perhaps the day before?

1       A    Correct.

2       Q    And that was stolen not from D.C., but from Prince

3  George's County, Maryland?

4       A    Correct.

5       Q    All right.  You said there was some property that

6  was found inside of the car; is that correct?

7       A    Correct.

8       Q    There was this gun that was actually underneath

9  the seat, or was it in front of the seat?

10      A    My understanding is when the vehicle was brought

11  to Mobile Crime, it was on the front floorboard.

12      Q    On the front floorboard on the passenger side?

13      A    Correct, the passenger side.

14      Q    And another individual was actually charged with

15  that gun; is that correct?

16      A    Correct.

17      Q    And that would have been Darryl Ingram?

18      A    Correct, the front passenger, correct.

19      Q    All right.  Was there any other property found in

20  the car, to your knowledge?

21      A    Not that I can recall.  There was stuff in the

22  trunk, but I -- I don't recall what the items were.

23      Q    Do you recall any -- any kind of notebook or

24  personal organizer being found in the car?

25      A    I don't recall.

1      Q    Okay.  Do you recall whether any other kinds of

2    analyses were done on the inside of the car?

3      A    My understanding is Mobile Crime processed the

4    vehicle.  I'm not sure what they processed the vehicle for.

5      Q    Okay.  So, you don't know if they processed it for

6    fingerprints or blood or anything like that?

7      A    My understanding was all of the above.

8      Q    All right.  Do you know whether those results are

9    in yet?

10      A    No, they are not in yet.

11      Q    Okay.  I want to talk about the injuries you

12    observed on the three people who were in the car, all right?

13    You said that Dorrell Ingram had a cut to the side of his

14    face or the side of his head; is that correct?

15      A    Correct.

16      Q    Okay.  And that was on his forehead?

17      A    Correct.

18      Q    And how would you describe that injury?

19      A    I'm not sure if it was sustained from the air bag

20    or possibly striking the steering column or --

21      Q    I guess I'm not looking for your conclusions as to

22    what caused it, but did it look like a cut, a bruise or

23    something else?

24      A    I was from a distance.  I can't tell you if it was

25    a birthmark, if it was a fresh cut, if it was a bruise.  It

1    was a visible mark.

2            THE COURT:  Let me ask you this.  I don't know how

3    much more you have, and I don't know how much redirect

4    you'll have.  We just had a note that you have a note from

5    your jury.  I don't know whether to break now or let you go

6    handle that note and come back or -- I don't want to cut you

7    short, because you may have a few more questions, and you

8    may have redirect questions and then the argument.  I think

9    I will let you go ahead and take care of the note and then

10   come right back.

11           We will take about a five-minute break.  It should

12   only take about five minute.

13           MR. SOROKA:  It shouldn't take long, Your Honor.

14           THE COURT:  Just let us know as soon as he walks

15   back in.

16           (Brief recess 12:25 p.m.)

17                        AFTER RECESS

18           (12:55 p.m.)

19           (Defendant present.)

20           THE COURT:  Okay.  Step back up, Officer.

21           Okay.  You may proceed.

22           Thereupon,

23                    KIMBERLY METIVIER,

24   having been previously sworn, testified further as follows:

25                CROSS EXAMINATION (continued)

1            BY MR. EDELMAN:

2      Q    We were talking about the injury that Dorrell

3    Ingram had on his head.  You said you only saw that from a

4    distance; is that correct?

5      A    Correct.

6      Q    Did any other officer give you a better

7    description of what that injury looked like than what you

8    were able to see yourself?

9      A    No.  They said it was a prominent mark over the

10   left eye.

11     Q    Did the officers note that it was bleeding?

12     A    No.

13     Q    Okay.  The -- Mr. Faultz was in the car also had

14   injuries?

15     A    Faultz.

16     Q    Faultz, excuse me.

17          How would you describe those injuries?

18     A    He verbalized that he had injuries, but none

19   visible.

20     Q    He said he had a broken leg?

21     A    He claimed to have a broken leg.

22     Q    Do you know if he was treated for that?

23     A    I don't know what his treatment was.

24     Q    When you saw him, was he able to walk?

25     A    No.  He claimed he couldn't walk and laid on the

57

1    ground clinching his leg.

2        Q    Viewing the car, is there anything in the back

3    seat that he could have been thrown into with any force?

4            MR. SOROKA:  Objection.

5            THE COURT:  That's sustained.  It calls for

6    speculation.  He could ask if there was anything found in

7    the back seat, but the rest of that question calls for

8    speculation the way it was phrased.

9            BY MR. EDELMAN:

10       Q    Was there anything found in the back seat?

11       A    I didn't view the back of the vehicle.

12       Q    All right.  Did Darryl Ingram have any injuries to

13   him?

14       A    Complained of injuries.  I didn't observe any.  I

15   wasn't concentrating on injuries.

16       Q    What injuries did he complain of?

17       A    I don't recall.

18           MR. EDELMAN:  I have no further questions.

19           THE COURT:  Any redirect?

20           MR. SOROKA:  No redirect.

21           THE COURT:  Thank you very much, Officer.

22           THE WITNESS:  Thank you.

23           MR. SOROKA:  No further evidence from the

24   Government.

25           THE COURT:  Okay.  Any evidence?

1          MR. EDELMAN:  Not at this time, Your Honor.

2          THE COURT:  Okay.  I will hear from you.

3          MR. SOROKA:  Your Honor, first as to probable

4    cause, Your Honor, the defendant is charged with second

5    degree murder, which a jury instruction on this type of

6    case --

7          THE COURT:  Are you asking the Court to make a

8    finding of probable cause, substantial probability or what?

9          MR. SOROKA:  Well, first off I would say there is

10   probable cause that applies on murder two.  There is also a

11   substantial probability in this case that the defendant

12   committed the offenses of murder two.  Based on the elements

13   of the offense, the defendant caused the death of the

14   decedent, in this case two decedents.  At the time he did

15   so, he acted in a conscious disregard of extreme risk of

16   death or serious bodily injury.

17         THE COURT:  Speak into this mike or that mike, one

18   or the other.

19         MR. SOROKA:  That he acted in a conscious

20   disregard of risk of death or serious bodily harm.

21         The factors in this case are a flight from police,

22   speeds at 35 miles an hour over the speed limit, running a

23   solid red light at a city intersection at a time of -- and

24   certainly not a time real early in the morning where this

25   would be a possibility that he might not hit somebody, but

59

1    about 9:20 in the evening that -- traffic, although not rush

2    hour traffic, is still fairly decent and fairly heavy, and

3    it is certainly a great chance that running a red light at a

4    high rate of speed is going to cause a death or serious

5    bodily harm to someone.

6         The results of the crash also indicate the high

7    rate of speed.  Cars ended up on the other side of the

8    street, on the sidewalk.  The two decedents, Mr. Williams

9    and Mr. Robinson, were trapped in the vehicle, pinned in the

10   vehicle, and virtually died upon impact.  I think the

11   pictures are illustrative of the force of that crash.

12        The car was also a stolen vehicle and being

13   operated, I would submit, with a dummy key.  The key stuck

14   in the ignition switch may well have been stuck in the

15   ignition at that point, but it wasn't to operate the

16   vehicle, I would submit to the Court, it was to prevent

17   people from knowing the car was being operated without a

18   key.  I think that our experience with -- my experience and

19   the Court's experience with UUVs is that it is a very common

20   occurrence.

21        As to the fact that this car was the same car that

22   was involved in striking the police vehicle in an attempt to

23   get away, the evidence is a very short period of time,

24   lookout for the same car, picked up seconds after the --

25   after the police incident.  I think it supports a

1    substantial probability that this defendant Mr. Ingram did

2    cause the death of Mr. Robinson and Mr. Williams through his

3    actions that were in a conscious disregard of the risk of

4    death and serious bodily harm.  So, I think there has

5    been -- substantial probability has been proven by this

6    witness's testimony in this case.

7           As to detention, the circumstances involved in

8    this case clearly indicate that this is not the type of case

9    where we have serious vehicular crashes that even rise to

10   the level of second degree murder where someone is operating

11   their own car under the influence of alcohol, or someone is

12   operating their own car in a reckless manner.  This is a

13   situation where someone is operating a stolen car.

14          Now, you can always get a stolen car, so the risk

15   of someone who could operate a stolen car in this manner is

16   greater than the risk of someone who goes out and on one

17   occasion operates their own car in a way that creates this

18   serious risk of serious bodily injury.  Once that car is

19   gone, then you can always argue that the risk to the

20   community is minimized, but that's not the case here in

21   Mr. Ingram's case.  The risk to the community is not

22   minimized, because it wasn't his car, it was someone else's

23   car.  It wasn't permission given to him; he just went and

24   took it.  At the end after the crash, his only thought was

25   to get away, the flight, the hiding.

1          There's nothing to prevent the potential of this

2    happening again, another stolen car.  The off chance is that

3    the police will try to stop it again, and then the flight

4    will occur again, and such flight, I submit, is not going to

5    be any less reckless the next time than this time.  So,

6    there is in this situation a substantial risk to the

7    community by release in this case.

8          Flight, I think the indication of flight, from

9    what happened in this incident, is an indication of the

10   willingness of this defendant to evade and avoid a potential

11   situation, although there is no certainly history of failure

12   to appear.

13         Now, it's true that this defendant is 16, going on

14   17 years old.  And I would submit to the Court that one of

15   the real ironies of our system is that if he would have been

16   charged with reckless driving, he would have had to have

17   been charged as an adult.  If he would have been charged

18   with driving while intoxicated, he would have had to be

19   charged as an adult because he is over the age for having a

20   driver's license:  16.  There's no juvenile charge.  But if

21   he kills somebody driving recklessly, then he also is facing

22   the same penalties as an adult in this case because of the

23   total recklessness.  It is not something that his age is any

24   bar to him or changes the status of his risk to the

25   community.

```
 1              I would ask the Court under 1325(a) to detain

 2     Mr. Ingram pending trial.

 3              THE COURT:  Hold it one second, Mr. Edelman.

 4              (Pause.)

 5              MR. EDELMAN:  Your Honor, I guess I want to make

 6     my argument two parts.  It is our position that the evidence

 7     in this case makes out cause only as to manslaughter and not

 8     second degree murder, and even if the Court does find that

 9     it makes out cause as to second degree murder, the

10     Government can't meet its burden by showing by clear and

11     convincing evidence that there are no conditions short of

12     detention for this young man that would ensure the safety of

13     the community.

14              Starting with the argument about this evidence,

15     even looking at it the way the Government wants to present

16     this, the vast majority of these cases, I believe, are

17     charged as manslaughter cases.  The reason why is the

18     difference between manslaughter and second degree murder in

19     terms of evaluation of the risk is a matter of subjectivity.

20     If the driver of the car knows of a risk, that's second

21     degree murder.  If he should have known of the risk, that's

22     manslaughter.  In other words, if you are doing something

23     where what you did you should have known that that created a

24     danger to somebody's life, that's not second degree murder.

25              THE COURT:  No, no, no, no, no, I think I
```

1      disagree.

2                 MR. EDELMAN:  I am looking at Comber.

3                 THE COURT:  Yeah?  If you operate in disregard of

4      a known -- of substantial risk, that's second degree murder.

5                 MR. EDELMAN:  If you are aware of the risk.  If

6      you are -- if it's a risk you should have been aware of but

7      were not, that is manslaughter.

8                 THE COURT:  But second degree murder -- I don't

9      have Comber in front of me -- let me see this thing you

10     have got here.

11                MR. SOROKA:  Jury instruction 4.25.

12                THE COURT:  Indulge me.  Let me just take a look

13     at that.

14                (Pause.)

15                THE COURT:  Element number 2 of second degree

16     murder.  Number 1 is that he caused the death, in this case

17     caused two deaths, by broad-siding that car that was in the

18     intersection when he ran the red light.  I will hear you on

19     that.  Number 2, that at the time that the defendant did so,

20     he acted in conscious disregard of an extreme risk of death

21     or serious bodily injury.

22                MR. EDELMAN:  Right.

23                THE COURT:  So, that's second degree murder if he

24     acts in conscious disregard of a risk.

25                MR. EDELMAN:  The red book uses the same language

1    for second degree murder and manslaughter.  Under Comber

2    I don't think that's correct.

3         Let me read footnote 12 from Comber, the

4    difference between second degree murder and manslaughter:

5    The fact that a reasonable person would have been aware of

6    the risk will not sustain the finding of malice, though it

7    may sustain the conviction for manslaughter.  The difference

8    between that recklessness which displays depravity and such

9    extreme and wanton disregard for human life as to constitute

10   malice and that recklessness that amounts only to

11   manslaughter lies in the quality of the awareness of the

12   risk.

13        THE COURT:  Right.

14        MR. EDELMAN:  In terms of the actor's awareness of

15   the risk to life, if he is aware of the risk, the crime is

16   murder and not involuntary manslaughter.  If he is not

17   aware, but he should have been aware, the crime is

18   involuntary manslaughter.

19        THE COURT:  Right.

20        MR. EDELMAN:  So, in this case the question is was

21   he actually aware, was the driver of the car actually aware

22   of the risk to human life --

23        THE COURT:  But you have got to define what you

24   mean by the risk.  He doesn't have to be aware of the risk

25   that 10 people might be in a truck that I am going to

```
 1    broad-side.  All he has got to be aware of is the risk that
 2    if I am flying down the street like a bat out of hell and
 3    running red lights, the risk that we are talking about is
 4    that somebody might get hurt or killed.
 5              MR. EDELMAN:  That --
 6              THE COURT:  And you would have to be almost out of
 7    it not to be aware of that.
 8              MR. EDELMAN:  I think that that, though, conflates
 9    the manslaughter and the murder mens rea, because, then, in
10    that case I don't think there would ever be a driving case
11    that would just be a manslaughter and not second degree
12    murder.
13              THE COURT:  The Government has a choice.  In these
14    situations the Government could have charged this as
15    manslaughter if it had so chosen, or it could charge him
16    with second degree murder.  That element of the awareness of
17    the risk fits there when you are talking about -- or should
18    have been aware of it on a manslaughter.  But if you are
19    aware of it, they can charge you either way, and they chose
20    to charge murder here.
21              MR. EDELMAN:  All right.  That's my --
22              THE COURT:  The risk is whether or not if you are
23    driving a car, flying down the street, not in an open
24    highway, not in a four-lane highway, but he's flying down
25    Sheriff Road in the middle of town at night where the
```

1    visibility is poor to start off with, worse than it is in

2    the daytime, and you are going 60 some miles an hour in a

3    25-mile zone, being chased by the police in a stolen car,

4    and you run a red light and don't even attempt to slow down,

5    if you are not aware of the risk, then you are asleep or

6    high on something.

7         MR. EDELMAN:  That's my argument with regard to

8    that.

9         In terms of detention itself, Your Honor, I think

10   that regardless of what the Court finds probable cause and

11   substantial probability on, I don't think the Government can

12   meet its burden by showing by clear and convincing evidence

13   that this young man is a danger to the community such that

14   there are no conditions of release that can be formed that

15   would protect the community upon his release.

16        He is 16 years old.  He is in -- preventive

17   detention is extreme -- would be an extreme remedy for

18   anybody.  I know sometimes it doesn't get treated that way.

19   Sometimes it gets treated as a matter of course, but I think

20   it's something to be extremely sensitive about generally and

21   particularly with this defendant Mr. Ingram because he is so

22   young.  His parents are here.  Both of them are here in

23   court today with him.

24        The Government is saying simply on the basis of

25   this act, they can conclude by clear and convincing evidence

1    that he is a danger to the community.  I think a 16-year-old

2    young man, two parents here, he is in school, Edison

3    Friendship, I have verified that, so I think there are

4    conditions of release the Court could fashion.

5         For example, the Court could place Mr. Ingram in

6    the heightened supervision program or the intensive

7    supervision program.  That would basically mean since he is

8    in school until 4:00 o'clock every day, and the curfew calls

9    begin at 8:00 o'clock, the risk of him doing anything in a

10    car would be extremely limited.

11         And there is no suggestion here, by the way --

12    this isn't the classic case appearing before you where we

13    have people running around with guns and knives and doing

14    things to people.  There isn't any notion that Mr. Ingram

15    does anything like that or that that is what he was setting

16    out to do that day.  No matter how you read his

17    interpretation, it's of a different character than that.

18         THE COURT:  That hasn't been totally decided

19    either.  I mean, that's up in the air.  There was a gun

20    found on the floorboard of that car, and although it was on

21    the passenger side on that floor, when this indictment

22    comes -- whenever we end up with the indictment, we may very

23    well charge him as well.  As you know, if he is the driver

24    of the car, and there is a gun found in the car, the

25    likelihood is that this indictment will name him as well on

1    that count.

2         MR. EDELMAN:  Well, I mean, there is no

3    allegation --

4         THE COURT:  So, I am just saying, you said this is

5    not like a case with a gun.  You wait until the indictment

6    comes up.

7         MR. EDELMAN:  It is different --

8         THE COURT:  I would be very surprised if this

9    indictment did not also charge him with possession or

10   carrying a pistol without a license.

11        MR. EDELMAN:  Well, it is certainly different than

12   someone who is using a gun in the course of a --

13        THE COURT:  I will grant you that.

14        MR. EDELMAN:  There is no allegation of that as

15   there is in the vast majority of the cases for preventive

16   detention with a gun or a knife.

17        If he were in intensive supervision, he would be

18   regularly drug-tested.  He would have a curfew.  The Court

19   would know where he is beginning at 8:00 o'clock every

20   evening until 6:00 o'clock the following morning and get a

21   report immediately if there was even one violation of that,

22   even one missed phone call.  The Court would have a very

23   good idea where Mr. Ingram was, and I think that would

24   substantially reduce whatever notion there is that he is a

25   danger to the community.

1          In addition, the Court could order Mr. Ingram not

2    to operate any motor vehicle, his or anyone else's.  That

3    would add an additional incentive that he could be found in

4    contempt if he violated that by driving a car.

5          Over all, Your Honor, I think that for this young

6    man sitting before you with no allegation of any past

7    conduct, just talking about this one incident, I think there

8    are conditions of release the Court could fashion that would

9    get him out of preventive detention in the D.C. jail between

10   now and the time of his trial.  I think it's an extreme

11   remedy in any case.  I think given the options available to

12   the Court, the Court does not need to do it in this case.

13          MR. SOROKA:  Your Honor, may we approach?  I think

14   this is best heard at the bench.

15          THE COURT:  Sure.

16          (Bench conference.)

17          MR. SOROKA:  Your Honor, in terms of -- the reason

18   I wanted to approach was because in terms of record of prior

19   contact with the law, at the presentment we were informed

20   by Court Social -- not Court Social Services -- by Pretrial

21   Services that the defendant did have a prior consent decree

22   for UUV and had a prior case that was DWIPD where he was a

23   UUV driver also in juvenile cases.

24          MR. EDELMAN:  There was one case that was no

25   papered several years ago.  The consent decree case was for

1  UUV passenger.  I looked at those jackets myself.

2            (In open court.)

3            MR. EDELMAN:  Oh, I'm sorry.  If we could?

4            (Bench conference.)

5            MR. EDELMAN:  Just so you're clear on it, the

6  consent decree case is over.  He completed that

7  successfully.  That case is dismissed.

8            (In open court.)

9            THE COURT:  All right.  I find substantial

10  probability that this defendant committed the offense of

11  second degree murder.  We've heard the testimony.  At the

12  very least, at the very least, what we are talking about in

13  terms of evidence, whether or not there is substantial

14  evidence that he committed this, there is testimony that

15  there is a car that is being driven that somebody, W-1, has

16  indicated that the occupants of that car, not necessarily

17  that car, but the occupants of that car had been involved in

18  a hit-and-run of three young children.

19            That witness tells the police that that car had

20  been dumped, and the people have gotten into another car,

21  namely this green Crown Victoria.  The police then spot a

22  car matching that description, namely the Crown Victoria,

23  and actually get out of the car or attempt to get out of the

24  car with gun drawn and tell the driver of that car, put your

25  hands where I can see them.

1       All they had to do then was just obey the officer,

2   and two lives would not have been lost, but instead of

3   obeying the officer and staying put and putting his hands up

4   where they could see them, he decides, the driver that is --

5   and I'm convinced at least by a substantial probability that

6   the driver is sitting right here in this chair, at this

7   table -- he decides to try to get away by first ramming into

8   a parked car.  When he couldn't get out that way, he backs

9   up into the police car.  The police officer is lucky that he

10  wasn't hurt as he was standing out there trying to get this

11  man's attention, and the man rams back into his police

12  vehicle.  So, he rams two vehicles, the parked car and then

13  he rams back into the police car, and takes off.

14      And that's when within seconds, within seconds,

15  two more officers, Phifer and Hodges, get word of what's

16  going on, spot the car up there at the 4400 block of Edson

17  Place, and the car -- and then they try to pull him over.

18  This is the second time that the car -- the police attempt

19  to stop the car.  The first time he rams the police car and

20  takes off.  The second time the police with the siren and

21  the lights going try to stop him on Edson Place, and he

22  takes off again, keeps going.

23      The speed escalates and gets up to about 60 miles

24  per hour in a 25-mile zone, and comes to 49th and Sheriff

25  Road and doesn't slow down at all, and runs right through

1    the red light, bam, and broad-sides the car, and those two

2    people that were in that car are now gone, dead.

3            Did he have a -- could he appreciate the extreme

4    risk that he was disregarding?  No question about it.  From

5    everything I've told you about this and everything I have

6    just said here indicates there was an extreme risk that that

7    kind of behavior could result in somebody being killed.

8            And the reason I'm convinced that it's this

9    defendant is the timing.  It is true that on this hearing we

10   don't have all of the testimony.  For instance, all the

11   officer said about -- here was that a witness indicated that

12   it knew the people that were involved in the hit-and-run of

13   the three children, and we don't have a witness to say that

14   with this defendant.  But you put it all together, they gave

15   a description of that car and the occupants, and the police

16   stop the car or attempt to stop a car, the defendant or the

17   person that's driving takes off, but within seconds -- so,

18   it's not enough time to switch drivers -- within seconds

19   that car is spotted by Phifer and this other officer.  They

20   give chase.  That chase leads right up to 49th and Sheriff

21   Road, where the car runs through the red light and kills

22   these other two people.

23           Then even then the defendant -- he is still

24   hell-bent on escaping.  Even then he doesn't just stay put.

25   After he has caused the death of these two people --

1    miraculously he has apparently suffered minor injuries, a

2    scratch on his head -- he jumps out of the car then and

3    takes off instead of sticking around.  And they have to

4    chase him down.  They chase him down and bring him back.

5    They lose sight of him momentarily, but then they see him

6    walking back with grass all in his hair and scratches on

7    him, and they put him under arrest.

8         This is a very substantial probability, in my

9    opinion, that he is going to be convicted of second degree

10    murder at trial, and all of these actions that he took that

11    night indicate to me clearly, A, he's a danger to the

12    community, and, B, he's a risk of flight.  I mean, he did

13    everything.  The reason these deaths occurred was because he

14    was trying to get away.  And even after they occurred, he

15    still tried to get away, hiding under porches.

16         So, he is both; he is a danger to the community

17    and a risk of flight, so he will be held without bond under

18    1325.

19         Let's pick a date.  How soon do you think you will

20    have an indictment in this case?

21         MR. SOROKA:  Your Honor, why don't we set a status

22    in 45 days?

23         THE COURT:  Okay.

24         Oh, and the other thing that I didn't even mention

25    except hastily here, and the thing that Mr. Soroka sort of

 1      emphasized, was this was a stolen car.  I mean, this car was

 2      driven with the ignition punched, having been reported

 3      stolen out there in P.G. County or so a day or two -- that

 4      adds -- that adds to the equation, too, to indicate the

 5      callous disregard here.

 6              Okay.  I think this is yours.

 7              MR. SOROKA:  Yes, it is.

 8              THE COURT:  Let's pick a date now for the felony

 9      status conference.

10              THE CLERK:  End of April?

11              MR. SOROKA:  End of April.

12              THE COURT:  How about Monday, April 29, at 9:00?

13              MR. EDELMAN:  That's fine.

14              MR. SOROKA:  That's fine.

15              THE COURT:  April 29 at 9:00 o'clock?

16              THE CLERK:  Yes, Judge.

17              THE COURT:  April 29 at 9:00 a.m. for felony

18      status conference.  Okay.

19              MR. EDELMAN:  Can I approach on another matter?

20              (Discussion off the record.)

21              THE COURT:  Okay.  That was April 29 at 9:00

22      o'clock for the felony status conference.  Okay.  We will

23      see you then.

24              (Proceedings concluded 1:25 p.m.)

25

```
 1                        CERTIFICATE

 2

 3          I, Bruce W. Herzfeld, an Official Court Reporter

 4   for the Superior Court of the District of Columbia, in my

 5   official capacity, do hereby certify that I reported by

 6   machine shorthand the proceedings had and testimony adduced

 7   in the case of United States v. Dorrell Ingram, case number

 8   F-1160-02, in said court on the 15th day of March, 2002.

 9            I further certify that the foregoing 75 pages

10   constitute the official transcript of the proceedings as

11   taken from my stenographic notes and reviewed with my backup

12   tapes to the best of my ability.

13            In witness whereof, I have hereunto subscribed my

14   name, this the 8th day of April, 2002.

15

16                          Bruce W. Herzfeld

17                          Official Court Reporter

18

19

20                                           RECEIVED
21                                           Apr 12  8 20 AM '02
22                                           COURT/REPORTERS/DIV.
23                                           DISTRICT/OF/COLUMBIA
24                                           COURTS

25
```